**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

———————————————————————   :
                                :
**UNITED STATES SECURITIES**          :
**AND EXCHANGE COMMISSION,**          :
                                :
           **Plaintiff,**              :
                                :          **CASE NO.**
           **v.**                     :
                                :
**The Estate of VINCENT JAMES SAVIANO,**   :
**And PALMETTO INVESTMENTS, LLC,**    :
                                :
           **Defendants,**             :
———————————————————————   :

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows:

1.      This case centers on a fraudulent scheme perpetrated by Vincent James Saviano ("Saviano") a/k/a Jim Saviano, now deceased, through his company Palmetto Investments, LLC ("Palmetto").

2.      Starting no later than 2010, Saviano – acting through Palmetto – marketed a trading program to investors called the Palmetto Investment Portfolio (the "PIP").  The PIP was an investment pool that purportedly made money through "extreme day trading" of stocks conducted by Saviano.

3.      Although not registered with the SEC, Saviano and Palmetto acted as investment advisers to the PIP and its investors; they were responsible for all investment decisions and all trading activity on investors' behalf and collected fees for their services to the PIP and its investors.

4.      To prospective and existing investors, Saviano and Palmetto portrayed the PIP as an astounding success. Saviano told prospective investors – both orally and in a written prospectus – that the PIP had enjoyed historical returns of between 5.2% and 10.58% per month.

5.      Once someone invested – thereby becoming a "member" of the PIP – they received reports of uninterrupted gains; Saviano and Palmetto sent PIP investors monthly and quarterly performance statements that (a) identified the profitable trades completed on the PIP's behalf, (b) reported consistent gains for each month and quarter, and (c) showed corresponding gains in the investor's account balance. They also reassured investors that the PIP was receiving investment advice from an established investment adviser that was registered with the SEC.

6.      Based on these representations, Saviano was able to raise at least $1.96 million for the PIP from at least 100 investors.

7.      In reality, the PIP was an unmitigated failure. Far from generating the advertised, consistent monthly gains, Saviano's trades routinely lost money. From 2011 through 2013, Saviano lost money for the PIP in all but 5 months. The five times that Saviano made a monthly gain, the gains (a) fell far short of the gains Palmetto represented to prospective and existing investors and (b) did nothing to stem the overall downward trajectory of the PIP.

8.      Saviano kept his massive trading losses hidden, routinely reporting to investors that the PIP's gains were continuing unabated.

9.      In addition to suffering massive, undisclosed trading losses, Saviano admitted to a select group of PIP investors that he had misappropriated an unidentified portion of investor funds to feed his gambling habit.

10.     In sum, while Saviano told investors that they were receiving extraordinary gains and that their principal was intact, investors in the PIP lost almost everything. In total, from January 2011 to September 30, 2014, Saviano invested approximately $947,728 in day trades through Palmetto's brokerage accounts.  During that time, he lost at least $768,000 of those funds, or 81.04% of the funds invested.

11.     By making repeated material misrepresentations to prospective and existing investors about the nature and performance of their investments, Saviano and Palmetto committed securities fraud.

12.     On October 6, 2014 – shortly after confessing to some of the PIP's investors – Mr. Saviano was found dead at his residence from an apparent suicide. The SEC, therefore, has brought this action against Mr. Saviano's estate and Palmetto to secure investor funds that remain in the name of Mr. Saviano and Palmetto, to prevent further harm to investors through the dissipation of assets, and to seek disgorgement stemming from Saviano's and Palmetto's wrongdoing so that any funds that remain can be returned to investors who were the victims of the fraud.

## JURISDICTION AND VENUE

13.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)], and Section 209 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9].

14.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

15.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. The acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan and elsewhere.

16.     Saviano and Palmetto each resided and transacted business within the Eastern District of Michigan.

17.     Saviano and Palmetto directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS AND RELATED PARTIES

18.     **Vincent James Saviano** was a resident of Rochester Hills, Michigan. He was the sole owner and officer of Palmetto Investments, LLC. Saviano – acting through his investment advisory business, Palmetto – acted as the investment adviser and "portfolio manager" to a pooled investment vehicle that Saviano called the "Palmetto Investment Portfolio" (the "Portfolio" or "PIP").  On October 6, 2014 – after confessing his fraud to several PIP investors – Mr. Saviano was found dead in his home from an apparent suicide.

19.     **The Estate of Vincent James Saviano** is the successor in interest to Mr. Saviano who is deceased. As of the date of this Complaint, the executor of Mr. Saviano's estate is unknown.

20.     **Palmetto Investments, LLC** is a Michigan Limited Liability Company formed in August 2008. Palmetto was the unregistered investment advisory vehicle through which Saviano managed money on behalf of investors in the PIP.

## FACTS

## <u>BACKGROUND ON PALMETTO AND THE PIP</u>

21.     Vincent Saviano formed Palmetto in 2008. He was Palmetto's sole member, sole employee and sole officer. Palmetto was run out of Saviano's home in Rochester Hills, Michigan.

22.     Acting through Palmetto, Saviano operated a trading program called the Palmetto Investment Portfolio (the "Portfolio" or "PIP").

23.     The PIP was purportedly a "collective" investment pool which individuals could join as "members." Saviano claimed that he would use members' principal to conduct "extreme" day trading of stocks. The members were to split the resulting profits after paying fees to Saviano and Palmetto.

24.     The PIP is not a legal entity. Client investment proceeds are not invested in any fund.  Rather, Saviano directed client funds into two brokerage accounts in the name of Palmetto that Saviano used to day trade.

25.     Saviano claimed that the PIP was a resounding success. He claimed that over seven years of running the PIP, his day trading generated monthly returns ranging from a low of 5.2% to a high of 10.58%. He claimed that the PIP had never encountered a monthly loss.

26.     Although neither is registered as an investment adviser with the SEC, both Saviano and Palmetto acted as investment advisers to the PIP and its investors. Saviano –

acting through Palmetto – made all investment decisions for the PIP and, in return, investors were to pay Palmetto and Saviano fees, including a performance-based fee equal to 4-6% of any profits earned from Saviano's trades.

27.     Starting no later than 2010, Saviano, through Palmetto, started offering and selling investment interests in the PIP to prospective investors.

28.     The investment interests in the PIP are "securities" as that term is defined in Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10).

29.     Until Saviano's death on October 6, 2014, Saviano and Palmetto raised at least $1.96 million in investments in the PIP from over 100 investors. The investors live in at least one foreign country (Australia) and at least 12 different states (including Michigan, Georgia, California and Florida).

## THE FRAUDULENT MARKETING OF THE PALMETTO SCHEME

30.     In marketing the PIP, Saviano provided prospective and then-current investors with a written prospectus. Saviano created and distributed at least three different versions of the prospectus to investors since he started marketing the PIP.

31.     Each version of the PIP prospectus described the PIP as a pooled investment vehicle that earned money through the day trading of the equity securities of small, medium and large-cap publicly traded companies.  Each version also details how clients who invest in the PIP become "members" of a "collective," and purportedly share equally in the profits and losses of all trades.

32.     The various PIP prospectuses further state that the PIP used proprietary software, stock charts and economic analysis to determine when to purchase or sell a particular stock.

33.     According to the prospectus – in exchange for their services to the PIP –
Saviano and Palmetto would charge PIP members various fees, including a start-up fee of
$325, a monthly account administration fee of $25, and a quarterly performance fee ranging
from 4-6% of profits.

34.     In marketing the PIP "opportunity," Saviano – through Palmetto – also
communicated with prospective investors over the phone and met with them in person to
market the PIP investment opportunity.

**Saviano and Palmetto Misrepresent the PIP's Historical Returns**.

35.     The 2012 and 2013 versions of the PIP prospectus contained numerous
material misrepresentations regarding the PIP's historical rate of return.

36.     At the outset, the various versions of the PIP prospectus were inconsistent
with one another, reporting different historical performance for the same periods of time.
For example, the September 2012 PIP prospectus and two versions of the December 2013
PIP prospectus reported different returns for each quarter of 2011:

| Reported Returns | | | |
|---|---|---|---|
| | Sept. 2012 | Dec 2013 Version 1 | Dec 2013 Version 2 |
| 1st Qtr. 2011 | 8.38% | 6.47% | 8.31% |
| 2nd Qtr. 2011 | 8.51% | 7.43% | 8.36% |
| 3rd Qtr. 2011 | 8.61% | 7.34% | 8.61% |
| 4th Qtr. 2011 | 7.63% | 7.04% | 7.96% |

37.     More importantly, the historical performance data in each version of the
prospectus was false. For example, rather than experiencing the impressive gains reported

for each quarter of 2011 identified in ¶ 36 above, in reality the PIP experienced significant

losses in the first three quarters of 2011 and only a negligible gain in the fourth quarter of

2011.  The PIP's actual performance in 2011 was as follows:

| Period | Actual Quarterly Returns for the PIP |
|---|---|
| 1st Qtr. 2011 | - 45.33% |
| 2nd Qtr. 2011 | -23.40% |
| 3rd Qtr. 2011 | -20.70% |
| 4th Qtr. 2011 | 0.33% |

38.    The December 2013 versions of the PIP prospectus reported consistent

historical gains for every quarter and every month from 2011 through 2013. The represented

quarterly gains from 2011 through 2013 ranged from a low of a 5.52% gain for the first

quarter of 2013 to a high of an 8.61% gain in the third quarter of 2011. These identified

gains were false. For example, the purported quarterly gains for 2012 and 2013 represented

in the December 2013 prospectus far exceeded the actual performance for that period:

| Period | Quarterly Gains Represented in Dec. 2013 Prospectus | Actual Quarterly Returns |
|---|---|---|
| 1st Qtr. 2012 | 6.38% | 0.92% |
| 2nd Qtr. 2012 | 7.41% | - 6.51% |
| 3rd Qtr. 2012 | 7.34% | - 17.62% |
| 4th Qtr. 2012 | 7.00% | - 14.47% |
| 1st Qtr. 2013 | 5.52% | - 6.41% |
| 2nd Qtr. 2013 | 6.73% | - 20.70% |

| | | |
|---|---|---|
| **3rd Qtr. 2013** | 7.11% | - 9.57% |
| **4th Qtr. 2013** | 6.08% | - 3.86% |

39.     The December 2013 PIP prospectus showed equally impressive monthly returns for 2011 through 2013, ranging from an "absolute low" of a 5.2% gain in January 2012 to a high of a 8.09% gain in June 2012. Each version of the prospectus showed that the PIP had never lost money in any month from 2011 to 2013. These identified monthly gains were false. For example, the purported monthly gains for 2012 and 2013 represented in the December 2013 prospectus for "Type A" investors far exceeded the actual performance for that period:

| Month | Monthly Gains Reported in Dec. 2013 Prospectus | Actual Returns |
|---|---|---|
| 01/31/12 | 5.20% | - 2.68% |
| 02/29/12 | 5.80% | 1.95% |
| 03/31/12 | 7.20% | 2.05% |
| 04/30/12 | 7.36% | - 2.24% |
| 05/31/12 | 6.83% | - 7.46% |
| 06/30/12 | 8.09% | 0.35% |
| 07/31/12 | 8.09% | - 11.56% |
| 08/31/12 | 7.13% | - 5.25% |
| 09/30/12 | 6.88% | - 14.64% |
| 10/31/12 | 7.03% | - 16.10% |
| 11/30/12 | 7.01% | - 2.33% |
| 12/31/12 | 6.98% | - 6.41% |
| 01/31/13 | 5.39% | 1.89% |
| 02/28/13 | 5.27% | - 12.16% |
| 03/31/13 | 5.91% | - 12.28% |
| 04/30/13 | 6.00% | - 15.63% |
| 05/31/13 | 6.14% | - 39.05% |

| | | |
|---|---|---|
| 06/30/13 | 8.02% | - 37.37% |
| 07/31/13 | 7.79% | - 44.85% |
| 08/31/13 | 7.21% | - 42.04% |
| 09/30/13 | 6.27% | - 7.03% |
| 10/31/13 | 6.08% | - 19.48% |
| 11/30/13 | 6.10% | - 3.55% |
| 12/31/13 | 6.07% | - 6.83% |

40.     Saviano also misrepresented the PIP's historical performance in oral statements to prospective investors. While he was recruiting investors for the PIP, Saviano told at least one investor that the PIP averaged a 5.5% monthly return.

41.     The representations Saviano made to prospective PIP investors regarding the PIP's historical performance were false when made. In reality, in the 36 months from January 2011 through December 2013, the PIP lost money in all but five months. In the five months that the PIP made money, its profit was less than the "absolute lowest" 5.2% monthly gain that Saviano advertised in the PIP prospectus.

42.     In total, from January 2011 to September 30, 2014, Saviano invested approximately $947,728 in day trades through Palmetto's brokerage accounts.  During that time, he lost at least $768,000 of those funds, or 81.04% of the funds invested.

43.     Saviano acted with scienter when he misrepresented the monthly and quarterly returns in marketing the PIP to prospective investors. Saviano – acting through Palmetto – was the only person who conducted day trading for the PIP and the only person responsible for reporting performance to investors. He knew, or recklessly disregarded, that his day trading had not generated the returns that he had represented to investors and knew that – while he was touting the PIP as a very successful investment opportunity – the PIP was consistently losing money.

44.    Saviano's and Palmetto's misrepresentations regarding the historical performance of the PIP were material. In making an investment decision, a reasonable investor would consider it important that the PIP had not generated the stellar returns represented by Saviano orally and in the PIP prospectus, but rather had lost money in the overwhelming majority of months and had never earned a monthly gain equal to the represented "absolute lowest" 5.2% monthly gain.

**Saviano and Palmetto Tell Investors That the PIP is Managed by a Large, SEC-Registered Investment Adviser**.

45.    The December 2013 prospectus that Saviano and Palmetto created and distributed to prospective investors, falsely states that the PIP was "advised" by an investment adviser that Saviano identified by name (referred to herein as "IA 1"). IA 1 is a well-known investment advisory firm that is registered with the SEC as an investment adviser. IA 1 is one of the largest providers of exchange traded funds ("ETFs") in the United States, managing over 140 ETFs with over $28 billion of assets under management.

46.    In reality, IA 1 has never served as an investment adviser to any pooled investment vehicle offered by Palmetto or Saviano, has no business relationship of any kind with them, and has never provided any investment advice (or any other service) to the PIP.

47.    Defendants Saviano and Palmetto acted with scienter. At the time that they sent the PIP prospectus to investors, Saviano knew, or recklessly disregarded, that IA 1 had no relationship to Palmetto and was not providing any investment advice to the PIP.

48.    The misrepresentations in the prospectus identified in ¶ 45 were material. In making an investment decision, a reasonable investor would consider it important that the PIP was not receiving advice from a large SEC-registered investment adviser with over $28 billion under management in 2013, but rather was "advised" solely by Saviano – who was

not registered with the SEC in any capacity, and did not have more than $1 million under management at any point in 2013.

**Palmetto's Fraudulent Periodic Performance Statements**

49.     After an investor purchased an interest in the PIP, that investor typically received monthly and quarterly statements from Palmetto that reported the performance of the customer's investment.

50.     On information and belief, Saviano created and distributed the periodic performance statements that Palmetto sent to investors in the PIP. The statements came directly to clients by email from Palmetto until September 2014, when Saviano set up a Dropbox.com account to distribute the statements to investors.

51.     The PIP's monthly performance statements listed for the customer each of the individual trades purportedly completed in the PIP for that month and showed the customer (a) the gain or loss on each of those individual trades; (b) the total monthly return for that customer; and (c) the customer's total balance.

52.     The PIP's quarterly performance statements showed the investor's current balance, gains for that quarter, and Saviano's purported performance-based fee.

53.     The disclosures on Palmetto's periodic performance statements were false in three material respects.

54.     First, the monthly account statements sent to PIP investors included fake trading activity. To complete the illusion that the PIP was consistently making money, Saviano and Palmetto made sure that the monthly performance statements listed individual trades that were – almost exclusively – profitable. In most instances, the purportedly profitable trades identified in the monthly performance statements were complete

fabrications; the identified trades simply never took place. In other instances, Saviano and Palmetto used real trades but reported fake volume and price information to make the trades look more profitable than they really were.

55. Second, the disclosed returns in the monthly and quarterly statements issued by Palmetto from at least March 2013 through August 2014 were false. The client statements disclosed consistent, uninterrupted monthly and quarterly gains for the PIP. For example, the periodic performance statements issued by Palmetto showed uninterrupted monthly and quarterly gains for the PIP for the period between March 2013 and August 2014.

56. In reality, from March 2013 through August 2014, the PIP made a monthly profit only once – in January 2014 – and never experienced a quarterly gain.

57. Third, since at least June 30, 2014, the total account balance identified in each monthly and quarterly statement issued to PIP investors also was false. In the monthly and quarterly statements to investors, Saviano (through Palmetto) represented that customers' account balances were increasing – in keeping with his story that the PIP had been enjoying consistent gains from his day trading.

58. In reality, the balance in Palmetto's accounts was actually decreasing and did not contain enough funds to redeem investors' principal (let alone the represented gains).

59. For example, as of June 30, 2014, the total amount in Palmetto's trading and bank accounts was insufficient to cover the monthly balance that just one client purportedly had in the PIP. As of that date, the total balance in Palmetto's bank and brokerage accounts had dwindled to $246,171. Shortly thereafter, Saviano – through Palmetto – sent a quarterly account statement to one PIP investor showing a June 30, 2014 account balance

for that investor of $913,404.  That balance disclosure was fraudulent; Palmetto did not
have enough assets to redeem that investor.

60.     In light of that asset deficiency, all account balance disclosures to PIP
investors as of June 30, 2014 were false.

61.     Saviano and Palmetto acted with scienter. At the time that they sent the
monthly and quarterly account statements to investors, Saviano knew, or recklessly
disregarded, that the representations to investors in those account statements were false.
Saviano knew, or recklessly disregarded, that (a) the identified profitable trades were fake,
(b) the reported monthly and quarterly profits were false, and (c) the PIP had experienced
severe losses and did not have sufficient assets to cover the account balances that they were
reporting to their customers.

62.     The misrepresentations in the customer account statements sent by Saviano
and Palmetto to their investors were material. In making an investment decision, a
reasonable investor would consider it important that their monthly and quarterly account
statements included (a) fake trading activity, (b) false performance data, and (c) inaccurate
account balance figures – all designed to mask extraordinary losses in the PIP.

**Saviano and Palmetto Take Fees From The PIP to Which They Were Not Entitled**

63.     As described in ¶¶ 55-56 above, Saviano and Palmetto reported grossly
inflated gains for the PIP for each quarterly period from at least March 2013 through August
2014. While they reported consistent gains during that period, in reality the PIP experienced
only one monthly gain (and no quarterly gain).

64.     Between March 2013 and August 2014 -- although the PIP was actually experiencing consistent losses -- Saviano and Palmetto charged the PIP a 4-6% quarterly performance fee based on their false reports of quarterly gains.

65.     Under the terms represented to investors, Saviano and Palmetto were not entitled to those performance-based fees. The prospectus represented that Saviano and Palmetto's fees would be based on 4-6% of profits earned during a quarterly period. In reality, those profits did not exist and Saviano and Palmetto were not entitled to the fees that they took from the PIP.

66.     Saviano and Palmetto acted with scienter.  They knew, or recklessly disregarded that the PIP had not earned the quarterly gains that they were representing to investors and that, therefore, they were not entitled to the performance-based fees that they were taking.

67.     The misconduct described above in ¶¶ 63-66 above was material. In making an investment decision, a reasonable investor in a pooled investment vehicle, like the PIP, would consider it important that the pool's investment advisers were charging performance-based fees to which they were not entitled.

## The Palmetto Scheme Collapses

68.     Throughout 2014, Saviano's day trading losses continued to mount. While he kept telling investors that they were earning profits on their investment in the PIP, by the end of September 2014, he had lost over 81% of the funds he managed for investors.

69.     Starting on October 1, 2014, as the Palmetto Portfolio collapsed, Saviano selectively notified certain investors that he had been lying to them. In those e-mails, he admitted that – not only had the PIP actually lost money – he had misappropriated investor

funds to fuel his gambling habit. For example, on October 1, 2014, Saviano sent an e-mail

to an investor in the PIP stating:

> "I have committed a terrible crime to my family and friends and there are
> no excuses for my actions. I have a huge gambling problem and it got the
> better of me a few years ago.
>
> I ran thru our money and then started using other individuals (sic) money
> to support my habit and needs; after a time the lies and the reality became
> jumbled in to (sic) one way of life…"

71.    On October 2, 2014, Saviano sent another e-mail to a group of four PIP

investors, stating that:

> "For many years I hid a terrible secret, one that now is causing so much
> pain and hurt I am having a hard time facing the truth. I have a gambling
> problem and it has caused my end. I ran thru our money some years ago
> and began using other's money thinking I could get it back, the lies and
> reality became one and then it just became a way of life…"

71.    On information and belief, Saviano and Palmetto did not provide a general

notice to PIP investors that revealed the truth about what happened to their investment.

72.    On October 6, 2014, Mr. Saviano was found dead at his Rochester Hills,

Michigan residence from an apparent suicide.

## COUNT I

### Violations of Sections 17(a) of the Securities Act

73.    Paragraphs 1 through 72 are realleged and incorporated by reference as

though fully set forth herein.

74.    By engaging in the conduct described in ¶¶ 30 - 62 above, Saviano and

Palmetto, in the offer and sale of securities, by the use of the means and instruments of

transportation or communication in interstate commerce or by use of the mails, directly or

indirectly:

a.  intentionally or recklessly engaged in fraudulent devices, schemes, artifices, transactions, acts, practices and courses of business;

b.  obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.  engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

75.     Saviano and Palmetto made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

76.     By reason of the foregoing, Defendants Saviano and Palmetto have violated Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

77.     Paragraphs 1 through 72 are realleged and incorporated by reference.

78.     As more fully described in ¶¶ 30 through 62, Saviano and Palmetto, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

79.     Saviano and Palmetto knew, or recklessly disregarded, the facts and circumstances described in paragraphs 30 through 62.

80.     By reason of the foregoing, Saviano and Palmetto violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT III

### Defendants' Violations of Sections 206(1) and 206(2)
### of the Investment Advisers Act of 1940

81.     Paragraphs 1 through 72 are realleged and incorporated by reference.

82.     During the relevant time period, Saviano and Palmetto acted as investment advisers to the PIP and investors in the PIP within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

83.     As more fully described in ¶¶ 30 through 67 above, Saviano and Palmetto, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, while acting as investment advisers, knowingly, willfully, or recklessly:  (a) employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, and courses of business that operated as a fraud or deceit upon clients or prospective clients.

84.     Saviano and Palmetto acted with scienter.

85.      By engaging in the conduct described above, Saviano and Palmetto, directly or indirectly, violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

### COUNT IV
### Violation of Advisers Act
### Section 206(4) and Rule 206(4)-8 Thereunder

86.     Paragraphs 1 through 72 are realleged and incorporated by reference.

87.     At all times relevant to this Complaint, Saviano and Palmetto acted as investment advisers to the PIP and investors in the PIP as defined under the Advisers Act.

Saviano and Palmetto managed the PIP and the funds of those who invested in the PIP in exchange for compensation in the form of performance and administrative fees.

88.     By engaging in the conduct described in ¶¶ 30 – 67 above, Saviano and Palmetto, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly: engaged in acts, practices or courses of business which are fraudulent, deceptive, or manipulative.  Saviano and Palmetto made untrue statements of a material fact to investors and prospective investors in the pooled investment vehicle known as the PIP, and engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to investors and prospective investors in that pooled investment vehicle.

89.     By reason of the foregoing, Saviano and Palmetto have violated Section 206(4) of the Advisers Act. [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. 275.206(4)-8] thereunder.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendant Palmetto, its successors, officers, agents, servants, employees, attorneys and those persons in active concert or participation with Palmetto who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the

transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act and Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(1), (2) and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**III.**

Issue an Order requiring Defendants to disgorge the ill-gotten gains received by Saviano and Palmetto as a result of the violations alleged in this Complaint, including prejudgment interest.

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**V.**

Grant such other relief as this Court deems appropriate.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: */s/* ***Amy S. Cotter***
Timothy S. Leiman (IL No. 6270153)
Alyssa A. Qualls (IL No. 6292124)
Amy S. Cotter (IL No. 6238157)
Ruta G. Dudenas (IL No. 6274848)

Attorneys for Plaintiff

**U.S. SECURITIES AND**
 **EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

Dated: October 9, 2014